IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| ANITA GAYLE RODGERS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 12-00050-N |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

ORDER

Plaintiff Anita Gayle Rodgers ("Rodgers") filed this action seeking judicial review

of a final decision of the Commissioner of Social Security ("Commissioner") that she

was not entitled to Disability Insurance Benefits (DIB) under Title II  and Supplemental

Security Income (SSI)  under Title XVI of the Social Security Act (the Act), 42 U.S.C. §§

401-33, 1381-1383c.  Pursuant to the consent of the parties (doc. 15), this action has been

referred to the undersigned Magistrate Judge to conduct all proceedings and order the

entry of judgment in accordance with 28 U.S.C. § 636(c) and Fed.R.Civ.P. 73.  *See* Doc.

17.  Plaintiff's unopposed motion to waive oral arguments (doc. 16) was granted on

September 10, 2012 (doc. 18).  Upon consideration of the administrative record (doc. 11)

and the parties' respective briefs (docs. 12 and 13), the undersigned concludes that the

decision of the Commissioner is due to be **AFFIRMED**.

I.      Procedural History.

Plaintiff Anita Gayle Rodgers filed applications on June 4, 2007 (Tr. 178-185; Doc. 12 at 1; Doc. 13 at 1), for disability insurance benefits (DIB) and supplemental security income (SSI) under Titles II and XVI of the Social Security Act (the Act), 42 U.S.C. §§ 401-433 and 1381-1383c, respectively.  Rodgers claimed disability beginning May 1, 2006 (Tr. 183), due to chronic obstructive pulmonary disease (COPD), palpitations, anxiety disorder, hypothyroidism, and irritable bowel syndrome (IBS) (Tr. 201).  Rodgers was thirty-seven years old at the time she filed her application (Tr. 197). The application was denied on October 1, 2007. (Tr. 90-96, 97-100).  Rodgers requested a hearing (Tr. 109) before an Administrative Law Judge ("ALJ").[1]  A short hearing July 21, 2009, concluded with directions for Rodgers to appear for a comprehensive adult gastrointestinal exam with a consultative expert.  (Tr. 29-59).   Rodgers returned and testified at a final hearing before the ALJ on January 20, 2010. (Tr. 56-89).   The ALJ issued an unfavorable decision on September 14, 2010.  (Tr. 12-28).  Rodgers  requested a review by the Appeals Council, which was denied  on December 2, 2011 (Tr. 1-6), thereby making the ALJ's decision the final decision of the Commissioner.  *See* 20 C.F.R. § 404.981 (2009).[2]  Rodgers has exhausted all her administrative remedies and now appeals from that final decision.

---

[1] The Commissioner processed Rodgers' application pursuant to 20 C.F.R. § 404.906(b)(4), whereby after the initial determination, the reconsideration step in the administrative review process is eliminated and the claimant can immediately request a hearing.

[2] All references to the C.F.R. (Code of Federal Regulations) are to the 2012 edition of part 404, which addresses claims under Title II of the Act. All cited regulations have parallel citations in part 416, (Continued)

II.     Claims on Appeal.

1.      Whether the ALJ erred in finding that Rodgers' COPD did not meet or equal the criteria of Listing 3.02A?

2.      Whether the ALJ erred by failing to address the medical opinion supplied by Michelle Jackson, M.D., an examining physician?

III.    Standard of Review.

        A.      Scope of Judicial Review.

In reviewing claims brought under the Social Security Act, this Court's role is a limited one.  Specifically, the Court's review is limited to determining: 1) whether the decision is supported by substantial evidence, and 2) whether the correct legal standards were applied. *See*, 42 U.S.C. § 405(g); Jones v. Apfel, 190 F.3d 1224, 1228 (11th Cir. 1999); Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990).  Thus, a court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner.  Miles v. Chater, 84 F.3d 1397, 1400 (11th Cir. 1996); Sewell v. Bowen, 792 F.2d 1065, 1067 (11th Cir. 1986).  Rather, the Commissioner's findings of fact must be affirmed if they are based upon substantial evidence. Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997); Chater, 84 F.3d at 1400; Brown v. Sullivan, 921 F.2d 1233, 1235 (11th Cir. 1991).   *See also*, Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990)("Even if the evidence preponderates against the Secretary's factual findings, we must affirm if the decision reached is supported by substantial evidence."); Bloodsworth

_____

which address claims under Title XVI of the Act

v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983) (finding that substantial evidence is

defined as "more than a scintilla but less than a preponderance," and consists of "such

relevant evidence as a reasonable person would accept as adequate to support a

conclusion[ ]"). In determining whether substantial evidence exists, a court must view the

record as a whole, taking into account evidence favorable as well as unfavorable to the

Commissioner's decision. Lynch v. Astrue, 358 Fed.Appx. 83, 86 (11th Cir. 2009);

Martino v. Barnhart, 2002 WL 32881075, * 1 (11th Cir. 2002); Chester v. Bowen, 792

F.2d 129, 131 (11th Cir. 1986).  Even where there is substantial evidence to the contrary

of the ALJ's findings, the ALJ decision will not be overturned where "there is

substantially supportive evidence" of the ALJ's decision.  Barron v. Sullivan, 924 F.2d

227, 230 (11th Cir. 1991).

B.    Statutory and Regulatory Framework.

The Social Security Act's general disability insurance benefits program ("DIB")

provides income to individuals who are forced into involuntary, premature retirement,

provided they are both insured and disabled, regardless of indigence. *See* 42 U.S.C. §

423(a). The Social Security Act's Supplemental Security Income ("SSI") is a separate

and distinct program. SSI is a general public assistance measure providing an additional

resource to the aged, blind, and disabled to assure that their income does not fall below

the poverty line. Eligibility for SSI is based upon proof of indigence and disability. *See*

42 U.S.C. §§ 1382(a), 1382c(a)(3)(A)-(C). However, despite the fact they are separate

programs, the law and regulations governing a claim for DIB and a claim for SSI are

identical; therefore, claims for DIB and SSI are treated identically for the purpose of

determining whether a claimant is disabled.  Patterson v. Bowen, 799 F.2d 1455, 1456 n. 1 (11th Cir. 1986). Applicants under DIB and SSI must provide "disability" within the meaning of the Social Security Act, which defines disability in virtually identical language for both programs. *See* 42 U.S.C. §§ 423(d), 1382c(a)(3), 1382c(a)(3)(G); 20 C.F.R. §§ 404.1505(a), 416.905(a). A person is entitled to disability benefits when the person is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). A "physical or mental impairment" is one that "results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D).

The Commissioner of Social Security employs a five-step, sequential evaluation process to determine whether a claimant is entitled to benefits. *See* 20 C.F.R. §§ 404.1520, 416.920 (2010).  The Eleventh Circuit has described the evaluation to include the following sequence of determinations:

(1) Is the person presently unemployed?

(2) Is the person's impairment(s) severe?

(3) Does the person's impairment(s) meet or equal one of the specific impairments set forth in 20 C.F.R. Pt. 404, Subpt. P, App. 1?[3]

---

[3] This subpart is also referred to as "the Listing of Impairments" or "the Listings."

(4) Is the person unable to perform his or her former occupation?

(5) Is the person unable to perform any other work within the economy?

An affirmative answer to any of the questions leads either to the next question, or, on steps three and five, to a finding of disability. A negative answer to any question, other than step three, leads to a determination of "not disabled."

McDaniel v. Bowen, 800 F.2d 1026, 1030 (11th Cir. 1986).  *See also* Bell v. Astrue, 2012 WL 2031976, *2 (N.D. Ala. May 31, 2012); Huntley v. Astrue, 2012 WL 135591, *1 (M.D. Ala. Jan. 17, 2012).

The burden of proof rests on a claimant through Step 4. *See* Phillips v. Barnhart, 357 F.3d 1232, 1237–39 (11th Cir. 2004). Claimants establish a *prima facie* case of qualifying disability once they meet the burden of proof from Step 1 through Step 4. At Step 5, the burden shifts to the Commissioner, who must then show there are a significant number of jobs in the national economy the claimant can perform. *Id*.

To perform the fourth and fifth steps, the ALJ must determine the claimant's Residual Functional Capacity (RFC). *Id*. at 1238–39. RFC is what the claimant is still able to do despite his impairments and is based on all relevant medical and other evidence. Id. It also can contain both exertional and nonexertional limitations. *Id*. at 1242–43. At the fifth step, the ALJ considers the claimant's RFC, age, education, and work experience to determine if there are jobs available in the national economy the claimant can perform. *Id.* at 1239. To do this, the ALJ can either use the Medical Vocational Guidelines, 20 C.F.R. pt. 404 subpt. P, app. 2 ("grids"), or hear testimony from a vocational expert (VE). *Id.* at 1239–40.

IV.    Relevant Facts.

    1.    Rodgers' vocational background.

Rodgers was born on March 11, 1970. (Tr. 64, 178, 183).  She was 36 years old on the alleged disability onset date of May 1, 2006 (Tr. 64, 178, 183), and 40 years old on April 6, 2010, when the ALJ issued his unfavorable decision (Tr. 9-28).  She graduated from high school (Tr. 64), and last worked May of 2006 in the deli of Bruno's Food World, cooking and slicing meats. (Tr. 71-72)[4].  Rodgers was previously employed as a cook at a restaurant (Tr. 72).

    2.    Rodgers' Testimony.

Rodgers testified that she is presently prescribed Levothyroid  for her hypothyroid condition, Albutrol for her emphysema, and medication identified only as "IBS pills" for her irritable bowel syndrome.  (Tr. 64-65, 235).  She also testified that her medications controlled her breathing problems "[s]omewhat." (Tr. 63-65). She testified she had difficulty breathing whenever she "overexert[ed] [her]self," after which she had to "sit for a while." (Tr. 65-66). She said she could not walk from her house to her mailbox, a distance of about 53 yards (Tr. 66). She described her IBS condition as alternating between constipation and diarrhea, which sometimes confined her to home (Tr. 66-67). She said she treated her IBS with only over-the-counter medication and had diarrhea three or four times per day. (Tr. 67). She reported she had joint pain and hurt if she stood

---

[4] Rodgers' work history includes work as a cook at a Morrison's in Penington, Alabama from September 1993 to May 1994; at Lafferty's Fine Dining in Butler, Alabama from August 1996 to January 2004; and at Food World in Pensacola, Florida from September 2005 to May 2006.  (Tr. 234).

or sat for too long.  (Tr. 68-69).  She testified she still smoked one to two cigarettes per day. (Tr. 69).  She also reported difficulty balancing (Tr. 70) and the need to alternate between sitting and standing during the day.  (Tr. 75-76).

        3.   <u>Medical Evidence</u>.

Rodgers presented to the emergency room of Sacred Heart Hospital on May 15, 2006 with complaints of chest pressure, shortness of breath, nausea, dizziness, and heart irregularity that started three to four weeks prior. (Tr. 279-280).  The records indicate, however, that her symptoms were actually "resolved" at the time of her emergency room visit.  (Tr. 280). Rodgers reported smoking a pack of cigarettes per day for more than 20 years.  (Tr. 281). Her physical examination revealed expiratory wheezing, regular heart rate and rhythm, no tenderness in her abdomen or back, and normal bowel sounds, extremities, motor functioning, and sensation.  (Tr. 281).  Chest x-ray and echocardiogram study were normal.  (Tr. 284).  Rodgers underwent treatment with bronchodilators, after which she reported that "breathing [is] much better now."  (Tr. 286).  Her discharge diagnoses included non-cardiac chest pain, COPD, and bronchitis. (Tr. 284).   Medications, including Zithromax ("Z-Pack"), Albuterol inhaler and Prednisone, were prescribed. (Tr. 284).

Rodgers presented to the Escambia Community Clinic on November 20, 2006, with a complaint of palpitations, which were associated with no precipitating factor but was reported to be "aggravated by smoking."  (Tr. 343).  Rodgers was also reported to have presented a "list" of complaints which included facial spasms, "popping noises in her head," and "heart fluttering." (Tr. 343).  It was noted during this clinic visit that

Rodgers smoked two packs per day for the last 20 years. (Tr. 343). However, her physical examination revealed no abnormalities with respect to either her cardiovascular or pulmonary function, which resulted in an assessment of "Other specified cardiac dysrhythmias" and a plan to do an EKG and draw blood for a routine drug screen as well as a basic metabolic panel and thyroid test. (Tr. 345).

The following day, November 21, 2006, Rodgers presented to the emergency room of Sacred Heart Hospital with complaints of chest pain, headache, shortness of breath, and palpitations. (Tr. 267). She reported "feeling better" after a treatment with Xopenex (a bronchodilator) and Solumedrol (a steroid). (Tr. 270). She had "very vague complaints such as her lung fe[lt] like it [was] 'laying in [her] chest.'" (Tr. 270). A chest x-ray showed hyperinflation, but no infiltrates, pneumothorax, hemothorax, masses, cardiomegaly, heart failure, or effusions. (Tr. 272-73). An echocardiogram study was normal. (Tr. 273). A CT scan of the head showed no abnormalities. (Tr. 273). The discharge diagnosis was Palpitations and COPD and Albuterol and Prednisone (a steroid) were prescribed (Tr. 274).

On November 26, 2006, Rodgers presented to the Gulf Breeze Hospital Emergency room with complaints of shortness of breath, cough and palpitations. (Tr. 305-16). Chest X-rays revealed COPD but "no acute pulmonary disease." (Tr. 315). Rodgers was found to have adequate blood oxygen levels so the decision was made to treat her for bronchitis. (Tr. 307). Her palpitations resulted in an order for a Holter monitor. (Tr. 307). On December 4, 2006, a Holter monitor report showed that Rodgers had no significant tachycardia or bradycardia (Tr. 291-304).

9

On December 8, 2006, Rodgers was taken by ambulance to the Baptist Hospital Emergency room complaining of shortness of breath and palpitations of one months' duration.  (Tr. 320).  She was still wearing the Holter monitor from Gulf Breeze Hospital. (Tr. 320).  The initial assessment was done at 7:45 p.m. and she was discharged in "good" condition at 2:40 p.m. (Tr. 321).  She was instructed to quit smoking immediately and was given a prescription for anxiety medication[5].  (Tr. 324)

On December 12, 2006, Rodgers returned to Escambia Community Clinic where she reported that she did not fill her Albuterol prescription and continued to use tobacco products.  (Tr. 340).  She was found to be alert, anxious, and cooperative.  (Tr. 341).  She was in no acute distress and had minimal wheezing after nebulizer treatment, normal heart sounds and motor functioning.  (Tr. 341).  Chronic obstructive asthma with acute exacerbation, tobacco use disorder, and anxiety were diagnosed.  (Tr. 341-42). Medications were prescribed and smoking cessation was recommended.  (Tr. 341-42).

On May 12, 2007, Rodgers presented to the emergency room of Jeff Anderson Regional Medical Center with complaints of difficulty breathing and coughing.  (Tr. 363).  She was in no respiratory distress, but had prolonged expirations and diffuse wheezing. (Tr. 363).  She had a non-tender abdomen and normal extremity and neurological examinations.  (Tr. 363).  A chest x-ray showed Rodgers had COPD with hyperinflation and granulomatous change.   (Tr. 368).  COPD (acute exacerbation) and bronchitis were diagnosed and medications were prescribed (Tr. 366-67). On September

---

[5] The name of the medication is undecipherable.

15, 2007, Rodgers underwent emergency room treatment for dyspnea (shortness of breath) and back pain with medications (Tr. 357-61).

On September 18, 2007, Nina Tocci, Ph.D., examined Rodgers at the request of the state agency.  (Tr. 370-72).  She reported smoking three cigarettes per day, "down from 'a pack and a half'" starting at the age of 10.  (Tr. 370).  Dr. Tocci found Rodgers had neat clothing, fair grooming, good eye contact, a cooperative attitude, and a normal gait, posture, and motor activity. (Tr. 370).   Rodgers also had normal speech, affect, and orientation. (Tr. 371).  She had focused attention and concentration, no memory problems, good fund of information and comprehension, intact abstractive ability, and logical thought organization. (Tr. 371).  She also demonstrated good insight and judgment and average intelligence.  (Tr. 371).  Rodgers reported her daily activities included talking to her neighbor, walking, and watching television.  (Tr. 372).  She could complete her activities of daily living without assistance and drove a car.  (Tr. 372).  Dr. Tocci noted Rodgers "worked briefly and that most of her adult life she was a home maker until her divorce."  (Tr. 372).  She said Rodgers had the "ability to perform moderate tasks." (Tr. 372).  Dr. Tocci diagnosed dysthymia and opined that Rodgers' prognosis was "fair."  (Tr. 372).  On September 24, 2007, Rodgers underwent a pulmonary function test ("PFT"), reported by Dr. Abney, that showed she had pre-bronchodilator FVC (forced vital capacity) of 2.13 and FEV1 (forced expiratory volume after one second) of 1.09 and post-bronchodilator FVC of 2.18 and FEV1 of 1.29.  (Tr. 375-78).

On August 29, 2009, Thomasina Sharpe, M.D., examined Rodgers at the request of the state agency. (Tr. 413-18).  Rodgers reported she had hypothyroidism, lung problems, low back pain, Lyme disease, and IBS.  (Tr. 413).  She said she experienced joint pain to the point she required assistance bathing, but otherwise took care of all her activities of daily living. (Tr. 415).  She said she used a "swifter," vacuumed, put puzzles together, and played word-finding games.   (Tr. 415).  She said she smoked for years and "still smok[ed] some, but not as heavily," and had difficulty swallowing.  (Tr. 415).  Dr. Sharpe noted Rodgers got short of breath, even when talking, but had no problems taking off her socks and shoes, getting up and down, or sitting.  (Tr. 416).  She had some thyromegaly, distant and decreased breath sounds with some stridor (creaking or grating noise), but no wheezing or rhonchi, and regular heart rate and rhythm.  (Tr. 416).  She had some difficulty with coordination, station, and gait, muscle spasms and tenderness over her trepezius and lumbar paraspinal muscles, and hyperreflexia, but negative straight leg raising tests, full grip strength, and intact muscle bulk, tone, and sensation.   (Tr. 417).  Dr. Sharpe's assessment included: history of hypothyroidism with increased deep tendon reflexes and thyromegaly; lung problems with record showing asthma and COPD; smoking; irritable bowel syndrome; dysphagia with history of esophageal dilatation; low back pain; and history of Lyme disease (Tr. 418).

Dr. Sharpe completed a "Medical Source Statement of Ability to do Work-Related Activities (Physical)" and therein concluded that Rodgers could lift up to ten pounds frequently and up to 20 pounds occasionally; carry up to 20 pounds frequently; sit for six hours, stand for two hours, and walk for one hour each at one time; and sit for eight

hours, stand for four hours, and walk for two hours each in an eight-hour day.  (Tr. 406-407).  Dr. Sharpe also opined that Rodgers could occasionally reach, push, and pull with her upper extremities, climb, balance, stoop, kneel, crouch, crawl, be exposed to unprotected heights, moving mechanical parts, humidity and wetness, heat, and operating a motor vehicle, but never be exposed to dust, odors, fumes, pulmonaryirritants, or temperature extremes. (Tr. 408-10).  Dr. Sharpe stated Rodgers could perform activities like shopping, preparing simple meals, feeding herself, and tending to her personal hygiene, but could not walk a block at a reasonable pace on rough or uneven surfaces (Tr. 411).

On October 27, 2009, Rodgers underwent treatment for acute abdominal pain with intravenous Toradol (an anti-inflammatory), following which she reported feeling better and reported her pain as 2 on a scale of 10.  (Tr. 420-21, 423-27).  An abdominal CT scan showed a 2.4 centimeter left ovarian cyst and normal appearing right ovary (Tr. 428).  A chest x-ray showed Plaintiff had no cardiopulmonary disease (Tr. 429).

On February 8, 2010, Michelle Jackson, M.D., examined Rodgers at the request of the state agency. (Tr. 437).  Rodgers said she used a cane "off and on for balance" as a result of Lyme disease. (Tr. 438).  She said she got short of breath, but this "[was] not what really limit[ed] her." (Tr. 438).  She said she used to smoke half a pack of cigarettes per day since age 15 but recently dropped down to one to two cigarettes per day. (Tr. 438).  Rodgers complained of diarrhea "off and on," but no abdominal pain. She said her "diet kind of control[led] her IBS symptoms." (Tr. 438).  She denied dysphagia, stating she underwent esophageal dilation in 2003 and "ha[d] not had any problems with that

13

since."  (Tr. 438).  She complained of joint stiffness in her knees and hands. (Tr. 438).

She said she "d[id] housework," tried to cook, and had an Alabama driver's license.  (Tr.

440).  Dr. Jackson found that Rodgers had clear breath sounds with "no work of

breathing," a soft, non-tender abdomen, intact motor functioning, sensation, and reflexes,

normal gait, strength, grip, fine hand manipulations, paraspinal musculature, sensation,

and side- to-side bending, and no other tenderness in the small joints, hands, wrists,

shoulders, elbows, knees or ankles. (Tr. 441).  Rodgers underwent a chest x-ray, which

showed no acute abnormalities.  (Tr. 441).

Rodgers underwent three PFTs. Her first post-bronchodilator test showed an FVC

of 1.79 and FEV1 of .68. Her second post-bronchodilator test showed an FVC of 1.59

and FEV1 of .62. Her third post-bronchodilator test showed an FVC of 1.40 and FEV1 of

.61.  (Tr. 441).  Dr. Jackson noted that pre and post-PFT, Rodgers showed "good

understanding and fair effort," but noted Rodgers' effort "[went] down with subsequent

tries." (Tr. 441).  Dr. Jackson further noted that, using the same machine and conditions

after Albuterol "there did not appear to be much change at all."  (Tr. 441).  She noted that

Rodgers had "good understanding" but "poor effort through all 3 trials per the medical

assistant." (Tr. 441).  Dr. Jackson diagnosed COPD, ongoing tobacco abuse, history of

Lyme disease per patient, hypothyroidism, disequilibrium, and  IBS.  (Tr. 441).  She

stated Rodgers should not work around dust, fumes, etc." She noted Rodgers "did not

seem to get winded during the exam [] at all" and had no active joint  inflammation. (Tr.

441-42).  She stated Rodgers had a "real sketchy history of Lyme disease" and history of

IBS "but [it] seem[ed] to be fairly well controlled." (Tr. 442).  Although Rodgers

reported that she used a cane for balance, she did not need it during her examination and "she d[id] not seem to have much in the way of neurological findings." (Tr. 442). Dr. Jackson "d[id] not see why [Rodgers] could not go back to working as a cook unless there [were] fumes or dust, etc.," and otherwise qualified for "any number of sedentary jobs or job retraining based on her history" (Tr. 442).

On March 2, 2010, Dr. Jackson completed a "Medical Source Statement of Ability to do Work-Related Activities (Physical)" and therein concluded that Rodgers could lift and carry up to 20 pounds frequently and up to 50 pounds occasionally; could sit for three hours, stand for one hour, and walk for two hours each at one time; and sit for five hours, stand for three hours, and walk for three hours each in an eight-hour day. (Tr. 449-50). Dr. Jackson further opined that Rodgers could only occasionally reach, climb stairs and ramps, stoop, kneel, crouch, and crawl, but never climb ladders or scaffolds or balance. (Tr. 451-52). Rodgers was also found able to occasionally operate a motor vehicle and tolerate vibrations, but should never be exposed to unprotected heights, moving mechanical parts, humidity, wetness, dust, odors, fumes, and pulmonary irritants, and extreme cold or heat. (Tr. 453). Rodgers could also tolerate moderate noise and had no limitations on activities like shopping, traveling without a companion for assistance, preparing simple meals, and caring for her personal hygiene (Tr. 453-54).

4.    Vocational Expert's Testimony.

Sue Berthaume testified that Rodgers' past relevant work as a restaurant cook is classified by the Dictionary of Occupational Titles ("DOT") as being "in the medium category with an SVP of seven, or skilled." (Tr. 80). Rodgers' past work as a deli cook

is classified as by DOT as light, but, in Berthaume's opinion based on "the description in the file," it was "performed in the medium category, and that's an SVP of two, or unskilled."  (Tr. 80).

The ALJ then posed a hypothetical question, which incorporated by reference certain sections of the  "Medical Source Statement of Ability to do Work-Related Activities (Physical)" completed by Dr. Sharpe on August 29, 2009 (Tr. 81-82, *citing* Tr. 406-11).  The hypothetical thus included the following limitations:  frequently lifting up to 10 pounds, occasionally lifting 11-20 pounds, never lifting more than 20 pounds (Tr. 406); frequently carrying up to 20 pounds,  never carrying over 20 pounds (Tr. 406);  at one time can sit up to 6 hours, stand up to 2 hours, walk up to 1 hour (Tr. 407); in an 8 hour work day, can sit 8 hours, stand 4 hours and walk 2 hour (Tr. 407);  can frequently operate foot controls with either foot (Tr. 408); can occasionally climb stairs, ramps, ladders or scaffolds, balance, stoop, kneel, crouch and crawl (Tr. 409); can occasionally be exposed to unprotected heights, moving mechanical parts, operating a motor vehicle, vibrations, humidity and wetness, but never to extreme cold or heat and dust, odors, fumes and pulmonary irritants (Tr. 410); and cannot walk a block at a reasonable pace on rough or uneven surfaces but can perform activities like shopping, travel without a companion, ambulate without using a wheelchair or 2 canes or 2 crutches, use standard public transportation, climb a few steps at a reasonable pace with the use of a single hand rail, prepare a simple meal and feed herself, care for personal hygiene and sort, handle, use paper/files (Tr. 411).  In response, Ms. Berthaume said that such a person could

perform the work of a deli cook, as described by DOT at 316.684-014, which is light with an SVP of 2, or unskilled (Tr. 80, 83).

In a second hypothetical, the ALJ added the following limitations:  the ability to maintain attention and concentration for periods commensurate with jobs requiring short, simple instructions and some detailed instructions; and ability to understand, remember and carry out short, simple instructions and some detailed instructions (Tr. 83).  Ms. Berthaume testified that, even with these added limitations, such an individual could perform the work of a deli worker under DOT 316.684-014 (Tr. 83).  In addition, Ms. Berthaume testified that such an individual could perform work as a garment folder, DOT 789.687-066, which is unskilled, light and as to which 400,000 jobs are available in the national economy and 4000 in Alabama.  (Tr. 84-85).   The job of microfilm processor, DOT 976.385-010, was also proposed, which is also light, unskilled, with 48,000 available in the national economy and 200 in Alabama.  (Tr. 85).   Ms. Berthaume also proposed a job as production assembler, DOT 706.687-010, which is also light, unskilled, with 333,000 available in the national economy and 15,000 in Alabama.  (Tr. 85).

In a third hypothetical, the ALJ added the following limitations in use of the hands:  ability to only occasionally reach overhead or other directions and to push or pull (Tr. 85, *citing* Tr. 408).  In response, Ms. Berthaume testified that this limitation in reaching would preclude the individual from performing jobs as a garment folder, microfilm processor, and production assembler, but that jobs are available as a counter clerk, DOT 249.366-010, which is light and unskilled with an SVP of two, with 447,000 jobs available in the national economy and 8,900 jobs available in Alabama.  (Tr. 86).

Ms. Berthaume further testified that, at a sedentary, unskilled level, the hypothetical individual could perform the job of surveillance system monitor, DOT 379.367-010, of which there are 143,000 jobs available in the national economy and 2,800 in Alabama (Tr. 86).  Another such sedentary, unskilled job is call-out operator, DOT 237.367-014, with 48,000 jobs available in the national economy and 900 in Alabama (Tr. 86).

The ALJ then asked Ms. Berthaume whether an employer in such jobs would tolerate an individual who would require unscheduled restroom breaks, beyond the generally allotted morning, afternoon and meal period breaks, which lasted 15 minutes. (Tr. 87). Ms. Berthaume answered that such would not be tolerated. (Tr. 87).

5.    The ALJ's Decision.

The ALJ found at step two that Rodgers' COPD, tobacco abuse, low back strain, irritable bowel syndrome, and a recently diagnosed ovarian cyst were "severe" impairments[6], but determined at step three that Rodgers had not met her burden to show that her impairments or combination of impairments "meets or medically equals one of the listed impairments at 20 C.F.R. pt. 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926)." (Tr. 17, Finding No. 4).  The ALJ specifically found that:

> Pulmonary function tests prior to the alleged onset of disability showed that the claimant had FEV1 levels below listing level; however, these results

---

[6] The ALJ did not include hypothyroidism or Lyme's disease among Rodgers' impairments because "[s]he is under appropriate medical care for the hypothyroidism which is apparently stable and under control … [with] no indication of ongoing symptoms, complications or end-organ damage." (Tr. 15).  Similarly, the ALJ did not include Lyme's disease because "there is no objective evidence of this in the record."  (Tr. 15).

were without medication and the doctor noted that the claimant "tolerates her severe airflow obstruction remarkably well" (Exhibit 1F).  Pulmonary function tests after the alleged onset of disability demonstrates that the claimant had an FEV1 of 1.09 pre-drug and an FEV1 of 1.29 post-drug (Exhibit 10F).  Although the pre-drug level meets listing 3.02, the listing requires that the highest level be used in determining the severity of the pulmonary functioning and whether the impairment meets the listing.  "The highest values of the $FEV_1$ and FVC, whether from the same or different tracings, should be used to assess the severity of the respiratory impairment."  On administration of pulmonary function tests in February 2010, the claimant obtained results that meet Listing 3.02; however, she demonstrated poor effort and she did not seem to get winded during the physical examination (Exhibit 18F).  Because of the claimant's poor effort on the pulmonary function test and the conflicting findings from physical examination, the results of the pulmonary function tests performed in February 2010 are not considered valid.  Consequently, the claimant's chronic obstructive pulmonary disease does not meet the criteria of Medical Listing 3.02; however, the undersigned has considered the pulmonary function reports in determining the claimant's residual functional capacity.

(Tr. 17).   The ALJ also noted that "[t]he fact that the claimant's pulmonary functioning improved with medication shows that with treatment, the claimant's respiratory impairments are manageable.  (Tr. 19). The ALJ also addressed Rodgers' other physical ailments as follows:

The claimant's low back strain is not characterized by nerve root compression, spinal arachnoiditis, or spinal stenosis, and therefore does not meet Medical Listing 1.04.  Ovarian cysts and irritable bowel syndrome do not represent listed impairments, nor do they result in any signs, symptoms, or findings of such severity that a finding of medical equivalence would be warranted.  The claimant did not produce any physician's reports, x-rays, or other appropriate evidence to support a finding that the impairments meets or equals a listing.  There is no objective and credible medical findings based on medically acceptable clinical and laboratory techniques that show that a listing was met or equaled.

(Tr. 17).      The ALJ found that Rodgers' irritable bowel syndrome "is well controlled and requires little treatment."  (Tr. 20).  The record evidence demonstrates that she has

received little medical treatment for this condition and has reported that she effectively manages the condition with diet and over the counter medications. (Tr. 20, *citing* Exhibit 1F and 9E).

The ALJ also found that Rodgers' statements concerning the severity and limiting effects of her impairments were not entirely credible. (Tr. 22).   The ALJ noted that Rodgers "[d]espite serious complaints involving her pulmonary functioning, [Rodgers] continues to smoke one or two cigarettes per day." (Tr. 21)  The ALJ also found that the only medication that she takes for the [COPD] is Albuterol [and] [t]reatment notes show that her symptoms improved with treatment." (Tr. 21).   The ALJ also noted that Rodgers was not always compliant with treatment, preferring to "go to the emergency room when symptoms are exacerbated" rather than to fill prescriptions and receive regular medical treatment.  (Tr. 21).  The ALJ further found that Rodgers' "[c]hest x-rays have repeatedly been normal." (Tr. 21).  The ALJ also concluded that "[t]he lack of any routine treatment indicates the [COPD] is somewhat manageable with at home treatment and weighs against [Rodgers'] allegation of disabling symptoms." (Tr. 21).  Similarly, the lack of significant treatment for Rodgers' other impairments was held to weigh against Rodgers' allegation of disability and to support the residual functional capacity applied by the ALJ in this case.  (Tr. 21-22).

The ALJ actually determined that Rodgers had the residual functional capacity to perform less than a full range of light work (Tr. 19, Finding No. 5).[7]  Although this

---

[7] Specifically, the ALJ found that Rodgers could perform less than a full range of light
(Continued)

residual functional capacity precluded Rodgers from performing her past relevant work as a restaurant cook and a deli cook (Tr. 22, Finding No. 6), the ALJ determined that there were other jobs that Rodgers could perform, such as counter clerk, surveillance systems monitor, or call-out operator (Tr. 23, Finding No. 10). As a result, the ALJ determined that Massey was not disabled as defined in the Act (Tr. 23, Finding No. 11).

V.    Analysis.

1.    **ALJ did not err in finding that Rodgers' COPD did not meet or equal the criteria of Listing 3.02A.**

In order to establish disability under Listing 3.02A, Rodgers must establish that she has "[c]hronic obstructive pulmonary disease due to any cause, with the FEV (Forced Expiratory Volume) equal to or less than the values specified in Table I corresponding to the person's height without shoes."  20 CFR, Part 404, Subpart P, Appendix I, § 3.02A. Rodgers is reported to be 61 inches in height.  (Tr. 441).  Consequently, Listing 3.02A

---

work. (Tr. 17, Finding No. 5). Rodgers is deemed capable of not only lifting up to twenty pounds occasionally and ten pounds frequently, but carrying up to twenty pounds frequently.  (*Id.*)  She is also capable of sitting eight hours, standing four hours and walking two hours in an eight-hour workday. (*Id.*) The ALJ also found that Rodgers could frequently handle, finger and feel and occasionally reach in all directions and push and pull. (*Id.*)  Rodgers was also found capable of using her feet in the operation of foot controls and can occasionally climb stairs, ramps, ladders and scaffolds; balance stoop, kneel, crouch and crawl. Although Rodgers cannot tolerate exposure to dust, odors, fumes, pulmonary irritants, and extreme cold or heat, she can occasionally tolerate exposure to unprotected heights, moving mechanical parts, operating a motor vehicle, humidity, wetness and vibrations. (*Id.*)  Rodgers was found able to perform activities such as shopping; travel without a companion or assistance; ambulate without using a wheelchair, walker, or two canes or two crutches; use standard public transportation; climb a few steps at a reasonable pace with the use of a single handrail; prepare simple meals and feed herself; care for her personal hygiene; and sort, hand and use paper/files. (*Id.*)  Rodgers cannot, however, walk a block at a reasonable pace on rough or uneven surfaces. (*Id.*)  Finally, Rodgers can maintain attention and concentration and can understand, remember, and carry out jobs, with short, simple instructions and some detailed instructions.  (*Id.*)

requires Rodgers to obtain an FEV equal to or less than 1.15 during pulmonary function testing.[8]  20 CFR, Part 404, Subpart P, Appendix I, § 3.02A.   The regulations further require that the highest level of FVC and $FEV_1$ be used in determining the severity of a pulmonary impairment and whether it meets a respiratory Listing.  20 CFR, Part 404, Subpart P, Appendix I, § 3.00E ("The highest values of the $FEV_1$ and FVC, whether from the same or different tracings, should be used to assess the severity of the respiratory impairment.").  The regulations also require that "[a] statement should be made in the pulmonary function test report of the individual's ability to understand directions as well as his or her effort and cooperation in performing the pulmonary function tests." (*Id.*).  The regulations further require that "[s]pirometry should be repeated after administration of an aerosolized bronchodilator under supervision of the testing personnel if the pre-bronchodilator FEV1 value is less than 70 percent of the predicted normal value."  (*Id.*).

Rodgers argues that the ALJ erred because he rejected as invalid the pulmonary function tests performed by Dr. Jackson on February 8, 2010, which Rodgers contends establishes that she meets the criteria of Listing 3.02A.  (Doc. 12 at 9-10, *citing* Tr. 17, 441).  Rodgers takes issue not only with the ALJ's reliance on tests reported by Dr. Abney on 2007,[9] but argues that

---

[8] Once the COPD is established by appropriate clinical and laboratory findings, the severity of the respiratory impairment must be assessed by means of pulmonary function testing. 20 CFR, Part 404, Subpart P, Appendix I, § 3.00.

[9] Dr. Abney reported that Rodgers had pre-bronchodilator FVC (forced vital capacity) of 2.13 and FEV1 (forced expiratory volume after one second) of 1.09 and post-bronchodilator FVC of 2.18 and FEV1 of 1.29.  (Tr. 375-78).  The ALJ held that "[t]he fact that the claimant's pulmonary functioning improved with medication shows that with treatment, the claimant's respiratory impairments are manageable."  (Tr. 19).

the ALJ has ignored certain statements in Dr. Jackson's report and thus misinterpreted the

report's significance.  Specifically, Rodgers argues:

> Contrary to the ALJ's determination, Dr. Jackson noted in her report at Exhibit
> 18F that on "PFT's pre and post, patient did show good understanding and fair
> effort." (Tr. 441).  While Dr. Jackson did note that Ms. Rodgers' effort appeared
> to diminish upon subsequent tests, she subsequently added that Ms. Rodgers did
> in fact have abnormal PFTs, has a history of abnormal PFTs, and COPD.  (Tr.
> 441).  Regarding the ALJ's determination that Ms. Rodgers' respiratory
> impairments are manageable through treatment, this is inconsistent with Dr.
> Jackson [sic] note that "using same machine, same conditions, after Albuterol
> 0.083% there did not appear to be much change at all."  (Tr. 441).  The ALJ not
> only failed to address this fact, it directly refutes the ALJ's finding that Ms.
> Rodgers' respiratory impairments are manageable with treatment.  Based upon the
> foregoing the ALJ erred in determining that Ms. Rodgers' COPD did not meet or
> equal Listing 3.02A, and accordingly the Commissioner's decision should be
> reversed.

(Doc. 12 at 10).

Dr. Jackson's preliminary statement in the "Diagnostic" section of her report that "patient

did show good understanding and fair effort" (Tr. 441) cannot be taken in isolation as Rodgers

has done  (Doc. 12 at 10).  When she subsequently discusses the actual tests performed at that

time, Dr. Jackson herself expressly questions the validity of the tests as evidenced by her

statement "but note patient's effort did go down with subsequent tries . . . [and] [s]he had good

understanding but had poor effort through all 3 trials."  (Tr. 441).    Under the "Impression"

section of her report, Dr. Jackson states that  Rodgers "does have abnormal PFTs" but then

opines not only that Rodgers "did not give the best effort" but that "I do not see why she could

not go back to working as a cook unless there are fumes or dust, etc, that might aggravate her

COPD [in which case] she would qualify for any number of sedentary jobs or job retraining."

(Tr. 441-42).  The ALJ fully acknowledged Dr. Jackson's report, including her statements

concerning Rodgers' poor effort, which called into question the validity of the PFTs, conducted

in 2010 by Dr. Jackson.  Rodgers has proffered no evidence of any other more recent PFT

satisfies the criteria for Listing 3.02A.

Although  Rodgers challenges certain portions of the ALJ's residual functioning capacity

as inconsistent with Dr. Jackson's evaluation of Rodger's "Ability to do Work-Related Activities

(Physical)," she does not challenge the following findings by the ALJ's, which are consistent

with Dr. Jackson's evaluation:

> [Rodgers] can lift up to twenty pounds occasionally and ten pounds frequently
> and carry up to twenty pounds frequently.  . . .She can . . . walk for two hours in
> an eight hour workday.  She can occasionally reach in all directions and push and
> pull.  She can frequently handle, finger and feel.  She is able to occasionally climb
> stairs, ramps, . . .; balance; stoop; kneel; crouch; and crawl.  She . . . cannot
> tolerate exposure to dust, odors, fumes, and pulmonary irritants, or extreme cold
> and heat.  She can perform activities such as shopping; travel without a
> companion or assistance; ambulate without using a wheelchair, walker, or two
> canes or two crutches; use standard public transportation; climb a few steps at a
> reasonable pace with the use of a single handrail; prepare simple meals and feed
> herself; care for her personal hygiene; and sort, hand, and use paper/files. . . . She
> can frequently use her feet in the operation of foot controls. . . . She can tolerate
> occasional exposure to . . . operating a motor vehicle, . . . and vibrations.

(Tr. 19-20; *see also* Tr. 449-454).  Moreover, Rodgers does not dispute that the RFT's taken in

2007 demonstrated that her respiratory impairments were manageable with treatment because

they demonstrated that the $FEV_1$ increased from 1.09 to 1.29, or nearly 20%, after treatment with

a bronchodilator.  (Tr. 375).  Rodgers has proffered no evidence that the bronchodilators have

become ineffective.  Further, the record substantiates the ALJ's finding that Rodgers has "been

non-compliant with treatment . . .[and has] not received regular treatment for the respiratory

impairment . . .[, which indicates that the chronic obstructive pulmonary disease is somewhat

manageable with at home treatment and weighs against the claimant's allegations of disabling

symptoms."  (Tr. 21).

Rodgers argues that, "[i]n making his RFC determination, the ALJ relied solely on Dr. Sharpe's opinion of [her] residual function capacity, failing to acknowledge what weight, if any, was given to Dr. Jackson's assessment" and that "Dr. Jackson's opinion is noticeably inconsistent with the ALJ's finding." (Doc. 12 at 11).  As discussed below, Rodgers has failed to establish that the ALJ's RFC determination does not adequately and properly take into account Rodgers' "limitations resulting from chronic obstructive pulmonary disease and tobacco abuse." (*See* Tr. 19).

Rodgers acknowledges that she has the burden to prove that an impairment meets or equals a listed impairment.  (Doc. 12 at 9, *citing* <u>Wilkinson v. Bowen</u>, 847 F.2d 660, 662 (11th Cir. 1987)(" When a claimant contends that he has an impairment meeting the listed impairments, the burden is on the claimant to present specific medical findings that meet the various tests listed under the description of the applicable impairment, or, if in the alternative, he contends that he has an impairment which is equal to one of the listed impairments, the claimant must present evidence which describes how the impairment has such an equivalency.").   Based on the totality of the evidence that was before the ALJ, the undersigned finds that the ALJ did not err in concluding that Rodgers does not meet or equal Listing 3.02A.

2.     **ALJ did not err by failing to address the medical opinion supplied by Michelle Jackson, M.D., an examining physician.**

As indicated above, Rodgers argues that the ALJ erred because he "discussed only the limitations set forth in the consultative examination conducted by Dr. Sharpe" and did not "mention, or give the weight assigned to the medical opinion of Dr. Jackson, who conducted a consultative examination in February of 2010." (Doc. 12 at 11).  Rodgers contends that "Dr. Jackson's opinion is noticeably inconsistent with the ALJ's RFC

finding" in the following respects: 1) the ALJ held that Rodgers could sit for eight hours and stand for four hours in an eight hour day, while Dr. Jackson opined that she could sit for five hours and stand for three hours in an eight hour day; 2) the ALJ held that Rodgers could *occasionally* climb ladders and scaffolds, while Dr. Jackson opined that she could *never* do such activity; 3) the ALJ concluded that Rodgers could only *occasionally* balance, while Dr. Jackson opined that she should *never* attempt balancing; and 4) the ALJ held that Rodgers could *occasionally* be exposed to unprotected heights and moving mechanical parts, while Dr. Jackson opined that she should *never* be exposed to such heights or mechanical parts.  (Tr. 18, 450, 452, 453).  Rodgers argues that, because the ALJ was required to state the reasons he rejected Dr. Jackson's opinion and did not do so, "the Commissioner's decision should be remanded for proper consideration of Dr. Jackson's opinion."  (Doc. 12 at 12).

The Commissioner argues that remand is unnecessary because the ALJ specifically considered and referenced Exhibit 18F, which included Dr. Jackson's entire opinion and it was unnecessary for the ALJ to specifically discuss the limitations set forth in Dr. Jackson's opinion.  (Doc. 13 at 13-14, *citing* Tr. 17, 20, 438-48, 456; *see also* Dyer v. Barnhart, 395 F.3d 1206, 1211 (11th Cir. 2005), quoting Foote v. Chater, 67 F.3d 1553, 1567 (11th Cir. 1995) (internal quotation omitted) ("[T]here is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision, so long as the ALJ's decision . . . is not a broad rejection which is 'not enough to enable [the district court or this Court] to conclude that [the ALJ] considered her medical conditions as a whole'").  The Commissioner further argues that, even if Dr. Jackson's opinion was fully

credited, Rodgers' limitations under that opinion would not preclude her ability to

perform the jobs identified by the vocational expert, namely the jobs of counter clerk,

surveillance systems monitor, and call-out operator.  (Doc.13 at 14).[10]

"[T]he ALJ [is] required to state with particularity the weight he gave the different

medical opinions and the reasons therefor." Sharfarz v. Bowen, 825 F.2d 278. 279 (11th

Cir. 1987).[11]  In this case, the ALJ declared that Dr. Sharpe's opinion and findings on

examination were consistent with the record as a whole and, therefore, he "gives her

assessment significant weight and has incorporated it into the residual functional

capacity." (Tr. 22).  Although the ALJ did not specifically refer to the limitations

contained in Dr. Jackson's opinion, he specifically declared that his residual functional

_____

[10] The job of counter clerk is classified in DOT as light work.  See DOT § 249.366-010, 1991 WL672323. Light work requires standing or walking, off and on, for a total of six hours in an eight-hour workday. See SSR 83-10, 1983 WL 31251, at *6. Dr. Jackson opined that Rodgers could stand and walk for three hours each in an eight-hour workday. (Tr. 450). The DOT classifies the jobs of surveillance system monitor, DOT § 379.367-010, 1991 WL 673244, and call-out operator, DOT § 237.367-014, 1991 WL 672186, as sedentary work.  In sedentary work, sitting "should generally total approximately 6 hours of an 8-hour workday." SSR 83-10, 1983 WL 31251, at *5 (emphasis added). Dr. Jackson limited Rodgers to five hours of sitting, which is not necessarily inconsistent with the requirements of sedentary work. None of these jobs require climbing, balancing, stooping, kneeling, crouching, crawling, and reaching, or exposure to temperature extremes, wetness, humidity, vibration, atmospheric conditions, moving mechanical parts, or high exposed places. DOT § 379.367-010.

[11] Unlike the present case, Sharfarz involved an ALJ's opinion that the plaintiff could do medium work which was not only contrary to the opinion of "all of the treating and examining physicians" but was supported only by opinions from "nonexamining, nontreating physicians." 825 F.2d at 279. Similarly, McCloud v. Barnhart, 166 Fed.Appx. 410, 418-19 (11th Cir. 2006), is inapposite because the ALJ relied on a "non-examining, reviewing State psychologists' opinion" to discredit medical evidence and failed to explain why he discredited an examining psychologists' finding, both of which directly impacted the ALJ's finding concerning plaintiff's residual functional capacity as set forth in his hypothetical to the vocational expert. This case is also distinguishable from Green v. Comm'r of Soc. Sec., 2007 WL 4287528 (M.D. Fla. Dec. 4, 2007), in which the ALJ failed to weigh any of the medical opinions. In this case, Rodgers has failed to establish that the ALJ's opinion that she "has the residual functional capacity to perform less than a full range of light work" (Tr. 17, Finding 5) is contrary to Dr. Jackson's description of her physical limitations.

capacity determination was based upon his "consideration of the entire record," he referred to Exhibit 18 which included Dr. Jackson's entire opinion, and he discussed Rodgers' poor effort which invalidated the respiratory function tests conducted by Dr. Jackson.   (Tr. 17 and 19, *citing* Exhibit 18F).  In addition, Rodgers points to four inconsistencies between Dr. Sharpe's and Dr. Jackson's opinions but fails to discuss how such inconsistencies invalidate the ALJ's finding that Rodgers has the residual functional capacity "to perform less than a full range of light work."  Dr. Jackson's opinion also notably includes findings consistent with the ALJ's determination, including the observation that Rodgers had clear breath sounds with "no work of breathing," a soft, non-tender abdomen, intact motor functioning, sensation, and reflexes, normal gait, strength, grip, fine hand manipulations, paraspinal musculature, sensation, and side-to-side bending, and no other tenderness in the small joints, hands, wrists, shoulders, elbows, knees, or ankles.  (Tr. 438-48, 456).  Dr. Jackson's objective medical findings were in fact more consistent with the opinion of Dr. Sharpe than with her own opinion.[12]

Even if the ALJ were held to have erred by not specifically discussing the four limitations set forth in Dr. Jackson's opinion, the error was harmless and does not require reversal and remand.  Shinseki v. Sanders, 556 U.S. 396, 409 (2009) ("[T]he burden of showing that an error is harmful normally falls upon the party attacking the agency's determination."); Diorio v. Heckler, 721 F.2d 726, 728 (11th Cir. 1983) (when an

---

[12] This case is distinguishable from Jackson v. Astrue, 2007 WL 2428815, *5 (M.D. Fla. Aug. 17, 2007), a case in which the Court held that "both of the [medical] opinions [at issue] suggest limitations in excess of those found in the ALJ's mental RFC determination."

incorrect application of the regulations results in harmless error, the ALJ's decision will stand).  The decision of the ALJ in this case is due to be affirmed.

CONCLUSION

For the reasons set forth above, the Court concludes and it is therefore

**ORDERED** that the decision of the Commissioner of Social Security denying plaintiff's benefits be and is hereby **AFFIRMED**.

**DONE** this __8th__ day of February, 2013.

/s/ Katherine P. Nelson
**KATHERINE P. NELSON**
**UNITED STATES MAGISTRATE JUDGE**